[Cite as *State v. Jelks*, 2016-Ohio-5007.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2015-T-0028** |
| REGAN M. JELKS, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Trumbull County Court of Common Pleas, Case No. 2014 CR 291.

Judgment: Affirmed.

*Dennis Watkins*, Trumbull County Prosecutor, and *LuWayne Annos*, Assistant Prosecutor, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481 (For Plaintiff-Appellee).

*Michael A. Partlow*, 112 South Water Street, Suite C, Kent, OH 44240 (For Defendant-Appellant).

COLLEEN MARY O'TOOLE, J.

{¶1}     Appellant, Regan M. Jelks, appeals from the March 17, 2015 judgment of the Trumbull County Court of Common Pleas, sentencing her on two counts of complicity to improperly handling firearms in a motor vehicle.  On appeal, appellant

asserts her convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. For the reasons stated, we affirm.

{¶2} On April 11, 2014, appellant was indicted by the Trumbull County Grand Jury on three counts: count one, complicity to improperly handling firearms in a motor vehicle, a felony of the fourth degree, in violation of R.C. 2923.16(B) and (I); count two, complicity to improperly handling firearms in a motor vehicle, a misdemeanor of the fourth degree, in violation of R.C. 2923.16(C) and (I); and count three, involuntary manslaughter, a felony of the first degree, in violation of R.C. 2903.04(A) and (C). Appellant pleaded not guilty to all charges at her arraignment.

{¶3} The matter proceeded to a jury trial. Appellee, the state of Ohio, presented five witnesses to testify on its behalf. Appellant did not testify and presented no witnesses.

{¶4} In the late evening hours of October 18, 2013 and into the early morning hours of October 19, 2013, appellant and Taemarr Walker, her long-time boyfriend, celebrated his twenty-fourth birthday.[1] The couple started out at Milo's bar in Warren before going to a residence on Woodbine Avenue to drop off a birthday cake and some balloons. Appellant claimed she saw no weapons in her car at that time. Several minutes later, the couple parted company. Mr. Walker told appellant to pick him up later at II Hype, another Warren bar.

{¶5} Later that night, appellant proceeded to II Hype. Instead of parking there, appellant illegally parked at a nearby establishment, Nana's Soul Food. Shortly after midnight, Jeffrey Gifford, a May's Towing employee, was dispatched to tow appellant's

---

1. Appellant conceded in her appellate brief that Mr. Walker was a convicted felon. Mr. Walker also had no valid driver's license.

2

vehicle.  Mr. Gifford testified that although appellant was initially defensive, she agreed to move her car.  Appellant subsequently returned to II Hype and waited for Mr. Walker.

{¶6}    Thereafter, Mr. Gifford was called to pull an abandoned Pontiac Grand Am from a ditch along Rischer Road.  That vehicle belonged to Darlene Border.  Ms. Border testified her eyes were a little blurry, due to low blood sugar, which caused her to veer off the road and land in the ditch.  Officer Michael Krafcik was dispatched to the scene.

{¶7}    In the meantime, back at II Hype, appellant finally spotted Mr. Walker in the parking lot.  Although appellant knew Mr. Walker did not have a valid driver's license, she allowed him to driver her car.  Instead of going back to the Woodbine residence for the birthday celebration, Mr. Walker drove in the opposite direction toward Rischer Road.

{¶8}    Rischer Road was blocked off in order for Mr. Gifford to pull out Ms. Border's Grand Am from the ditch.  The lights on the tow truck and on Officer Krafcik's cruiser were activated to alert on-coming traffic of the temporary obstruction.  Mr. Walker and appellant approached the area in appellant's vehicle.  Despite the obstruction to the road, the flashing lights, and Officer Krafcik waving his arms, the officer testified Mr. Walker refused to stop.  Officer Krafcik believed there was going to be a collision.  However, Mr. Walker drove appellant's car off the side of the road into a ditch.

{¶9}    Officer Krafcik approached the vehicle to check on the occupants.  He observed a rifle laying across the back seat with the muzzle pointed in his direction.  The officer radioed for back up assistance and drew his service pistol.  Mr. Walker jumped from the front driver's seat to the back seat.  Officer Krafcik ordered Mr. Walker

3

to put his hands up.  As he did, the officer noticed Mr. Walker was wearing latex gloves.  Officer Krafcik continually shouted commands at Mr. Walker, telling him to "'stop, don't move, keep your hands up, if you touch the gun, I am going to shoot you.'"  Mr. Gifford, the tow truck driver who was still at the scene, testified the officer shouted these commands at least 10 to 12 times.

{¶10}  Mr. Walker, however, did not comply.  Rather, he reached for his pocket and dove back to the front seat.  Officer Krafcik saw Mr. Walker reach under the driver's seat and produce a pistol.  At that time, the officer fired a single round which shattered the passenger window.  He managed to shoot past appellant who was compliant but screaming hysterically.  The broken window temporarily obstructed the officer's view.  As it fell away, Officer Krafcik saw that Mr. Walker was still holding the pistol.  The officer fired three more times, killing Mr. Walker.

{¶11}  While waiting for back up assistance, Officer Krafcik removed appellant from the vehicle and placed her in handcuffs.  Sergeant Bryan Holmes responded and arrived at the scene.  EMT also arrived and determined Mr. Walker had no pulse.  Sergeant Holmes removed the Ruger pistol from Mr. Walker's hand, which he learned afterward was unloaded.  He also removed from the vehicle a loaded Heckler & Koch semi-automatic .22 caliber rifle with the safety off and in the "fire" position.

{¶12}  Appellant was interviewed three times in the early morning hours on October 19, 2013.  Charles Snyder, a special agent with BCI, testified appellant was very evasive.  He believed she was not being forthright.  According to Mr. Snyder, appellant never disclosed the source of the two guns found in her vehicle.  Also, appellant never admitted to seeing gloves on Walker until he put his hands up due to

4

Officer Krafcik's commands. Further, appellant could not explain why Mr. Walker drove her car in the opposite direction of the Woodbine residence after leaving II Hype.

{¶13} During the third interview, however, appellant admitted to seeing Mr. Walker with the guns when he got into her car at II Hype. Appellant saw him with the handgun on his person, i.e., in his pocket, and saw him put it on the floor of her vehicle. Appellant also saw Mr. Walker with the long rifle and believed he placed it inside her car when she went around the vehicle to get in the passenger's seat. In addition, appellant indicated she was "uncomfortable" during the ride to Rischer Road because she and Mr. Walker would both "go down" if they got pulled over by the police.

{¶14} At the close of the state's case, defense counsel moved for an acquittal pursuant to Crim.R. 29, which was overruled by the trial court. The defense presented no evidence.

{¶15} Following trial, the jury found appellant guilty on counts one and two, complicity to improperly handling firearms in a motor vehicle. The jury found appellant not guilty on count three, involuntary manslaughter.

{¶16} The trial court sentenced appellant to five years of community control on each count to run concurrently subject to the general rules of supervision of the Adult Probation Department. The court further imposed specific sanctions and conditions including, inter alia, serving 60 days in jail. A violation of her community control sanction would trigger an 18-month prison term on count one and 30 days on count two to be served concurrently. Appellant filed a timely appeal and asserts the following assignment of error:[2]

---

2. This court granted appellant's motion to stay the county jail time providing that she post a $10,000 supersedeas bond.

5

{¶17} "The appellant's convictions are not supported by sufficient evidence and are against the manifest weight of the evidence."

{¶18} In her sole assignment of error, appellant presents both a sufficiency and a manifest weight argument.

{¶19} With regard to sufficiency, in *State v. Bridgeman*, 55 Ohio St.2d 261 (1978), the Supreme Court of Ohio established the test for determining whether a Crim.R. 29 motion for acquittal is properly denied. The Court stated that "[p]ursuant to Crim.R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." *Id.* at syllabus. "Thus, when an appellant makes a Crim.R. 29 motion, he or she is challenging the sufficiency of the evidence introduced by the state." *State v. Patrick*, 11th Dist. Trumbull Nos. 2003-T-0166 and 2003-T-0167, 2004-Ohio-6688, ¶18.

{¶20} As this court stated in *State v. Schlee*, 11th Dist. Lake No. 93-L-082, 1994 Ohio App. LEXIS 5862, *13-15 (Dec. 23, 1994):

{¶21} "'Sufficiency' challenges whether the prosecution has presented evidence on each element of the offense to allow the matter to go to the jury, while 'manifest weight' contests the believability of the evidence presented.

{¶22} "'"The test (for sufficiency of the evidence) is whether after viewing the probative evidence and the inference[s] drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all of the elements of the offense beyond a reasonable doubt. *The claim of insufficient evidence invokes an*

*inquiry about due process. It raises a question of law, the resolution of which does not allow the court to weigh the evidence.'"*

{¶23} "In other words, the standard to be applied on a question concerning sufficiency is: when viewing the evidence 'in a light most favorable to the prosecution,' '(a) reviewing court (should) not reverse a [guilty] verdict where there is substantial evidence upon which the jury could reasonably conclude that all of the elements of an offense have been proven beyond a reasonable doubt.'"

{¶24} "On the other hand, 'manifest weight' requires a review of the weight of the evidence presented, not whether the state has offered sufficient evidence on each element of the offense.

{¶25} "'In determining whether the verdict was against the manifest weight of the evidence, "(* * *) the court reviewing the entire record, *weighs the evidence* and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. (* * *)'" (Citations omitted.) * * *" (Emphasis sic.) (Citations omitted.)

{¶26} Regarding sufficiency, "a reviewing court must look to the evidence presented * * * to assess whether the state offered evidence on each statutory element of the offense, so that a rational trier of fact may infer that the offense was committed beyond a reasonable doubt." *State v. March*, 11th Dist. Lake No. 98-L-065, 1999 Ohio App. LEXIS 3333, *8 (July 16, 1999). The evidence is to be viewed in a light most favorable to the prosecution when conducting this inquiry. *State v. Jenks*, 61 Ohio St.3d 259, paragraph two of the syllabus (1991). Further, the verdict will not be disturbed on

appeal unless the reviewing court finds that reasonable minds could not have arrived at the conclusion reached by the trier of fact. *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997).

{¶27} Regarding manifest weight, a judgment of a trial court should be reversed as being against the manifest weight of the evidence "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). The trier of fact is in the best position to assess the credibility of witnesses. *State v. DeHass*, 10 Ohio St.2d 230, paragraph one of the syllabus (1967).

{¶28} In this case, appellant was charged with, convicted of, and sentenced on two counts of complicity to improperly handling firearms in a motor vehicle. Count one involved a loaded semi-automatic rifle, in violation of R.C. 2923.16(B). Count two involved an unloaded pistol, in violation of R.C. 2923.16(C).

{¶29} R.C. 2923.03, "Complicity," states in part: "(A) No person, acting with the kind of culpability required for the commission of an offense, shall * * * (2) [a]id or abet another in committing the offense[.]"

{¶30} R.C. 2923.16, "Improperly handling firearms in a motor vehicle," states in part:

{¶31} "(B) No person shall knowingly transport or have a loaded firearm in a motor vehicle in such a manner that the firearm is accessible to the operator or any passenger without leaving the vehicle.

{¶32} "(C) No person shall knowingly transport or have a firearm in a motor vehicle, unless the person may lawfully possess that firearm under applicable law of this

state or the United States, the firearm is unloaded, and the firearm is carried in one of the following ways:

**{¶33}** "(1) In a closed package, box, or case;

**{¶34}** "(2) In a compartment that can be reached only by leaving the vehicle;

**{¶35}** "(3) In plain sight and secured in a rack or holder made for the purpose;

**{¶36}** "(4) If the firearm is at least twenty-four inches in overall length * * * and if the barrel is at least eighteen inches in length, either in plain sight with the action open or the weapon stripped, or, if the firearm is of a type on which the action will not stay open or which cannot easily be stripped, in plain sight."

**{¶37}** The record establishes that on or about October 19, 2013, appellant knowingly aided or abetted another in transporting or having a loaded and an unloaded firearm in a motor vehicle in which the loaded firearm was accessible to the operator or passenger without leaving the vehicle, and the unloaded firearm was not carried in a compliant manner. *See* R.C. 2923.03(A)(2); R.C. 2923.16(B) and (C). The record reveals appellant aided and abetted Mr. Walker, her long-time boyfriend and an unlicensed driver, in the commission of both weapon offenses by allowing him to place two firearms in her car and drive her vehicle carrying those weapons. Thus, appellant was more than an "innocent bystander." *See State v. Johnson*, 93 Ohio St.3d 240, 245 (2001) ("'participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.'") We note that the record is completely devoid of any evidence to suggest that appellant feared Mr. Walker in any way.

{¶38} As stated, the evening began as a birthday celebration. Appellant and Mr. Walker started out at Milo's bar before going to a residence on Woodbine to drop off a birthday cake and some balloons. Thereafter, the couple parted company and Mr. Walker told appellant to pick him up later at II Hype. Appellant complied and met him in the parking lot. Although appellant knew Mr. Walker did not have a valid driver's license, she allowed him to driver her car. Instead of going back to the Woodbine residence, Mr. Walker drove in the opposite direction toward Rischer Road.

{¶39} Rischer Road was blocked off in order for a tow truck to pull out a Grand Am that had veered off into a ditch. The lights on the tow truck and on Officer Krafcik's cruiser were activated to alert on-coming traffic of the temporary obstruction. Mr. Walker and appellant approached the area in appellant's vehicle. Despite the obstruction to the road, the flashing lights, and Officer Krafcik waving his arms, Mr. Walker refused to stop. Officer Krafcik believed there was going to be a collision. However, Mr. Walker drove appellant's car off the side of the road into a ditch.

{¶40} Officer Krafcik approached appellant's vehicle to check on the occupants. He observed a rifle laying across the back seat with the muzzle pointed in his direction. The officer radioed for back up assistance and drew his service pistol. Mr. Walker jumped from the driver's seat to the back seat. Officer Krafcik ordered Mr. Walker to put his hands up. As he did, the officer noticed Mr. Walker was wearing latex gloves. Officer Krafcik continually shouted commands at Mr. Walker, telling him to "stop" or he would "shoot."

{¶41} Mr. Walker, however, did not comply. Rather, he reached for his pocket and dove back to the front seat. Officer Krafcik saw Mr. Walker reach under the driver's

10

seat and produce a pistol. The officer fired several shots, killing Mr. Walker. Sergeant Holmes removed the Ruger pistol from Mr. Walker's hand, which he learned afterward was unloaded. He also removed a loaded semi-automatic .22 caliber rifle with the safety off and in the "fire" position.

{¶42} Appellant was interviewed three times. Special agent Snyder testified appellant was very evasive. According to Mr. Snyder, appellant never disclosed the source of the two guns found in her vehicle. Also, appellant never admitted to seeing gloves on Walker until he put his hands up due to Officer Krafcik's commands. Further, appellant could not explain why Mr. Walker drove her car in the opposite direction of the Woodbine residence after leaving II Hype.

{¶43} During the third interview, however, appellant admitted to seeing Mr. Walker with the guns when he got into her car at II Hype. Appellant saw him with the handgun on his person, i.e., in his pocket, and saw him put it on the floor of her vehicle. Appellant also saw Mr. Walker with the long rifle and believed he placed it inside her car when she went around the vehicle to get in the passenger's seat. In addition, appellant indicated she was "uncomfortable" during the ride to Rischer Road because she and Mr. Walker would both "go down" if they got pulled over by the police.

{¶44} The dissenting judge does not agree that there was sufficient evidence to support appellant's convictions for complicity to improperly handling firearms in a motor vehicle. The dissenting judge believes appellant was an "innocent bystander."

{¶45} At the jury trial, the recorded interviews were discussed and played for the jury. Despite initial claims that she did not know about any weapons before Mr. Walker drove the car into the ditch, during the third interview with BCI agents, the testimony

11

establishes that appellant acknowledged seeing Mr. Walker with the guns when he got in her car, was nervous if they got pulled over, and just wanted to go home.

{¶46} Agent Snyder testified on cross-examination (pages 410-411 of the transcript): "I don't think [appellant] was forthright with us in the beginning. She became more forthright during the second and third interview. * * * I start off with the first interview, she denies any knowledge of any weapons and in the second interview she acknowledges that she sees some weapons in the car after the shooting occurs. And in the third interview, she acknowledges that when they left the bar, she saw Taemarr with a gun on his person and hide it on the floor - - or set it on the floor of the car."

{¶47} In addition, the following exchange took place between defense counsel and Agent Synder on cross-examination (pages 417-419 of the transcript):

{¶48} "Q. All right. So if we look at the - - this transfer of whatever happened in that parking lot of II Hype, shows up, I'm driving. [Appellant] gets out of the car, goes around the front. [Mr. Walker] puts those guns - - it is apparent that he puts those guns in the car during that change of drivers, correct?

{¶49} "A. I believe that's possible, yes.

{¶50} "* * *

{¶51} "Q. Okay. Fine. So now by the time anything happens, according to [appellant,] according to your investigation, she's seated in the passenger seat and he's driving off with guns in the car, right?

{¶52} "A. When - - during the third interview, she indicates that she sees him take a gun from his - - possibly out of his waistband out of his pants and put it under the seat and then they leave.

12

{¶53} "* * *

{¶54} "Q. She also told you that she was concerned.  She was concerned about now that there were guns in this car about the - - I think she said safety?

{¶55} "A. I believe she said that they would both go down for them.

{¶56} "Q. Right.  She also said that he didn't have a license and I was not going to let Taemarr have my car?

{¶57} "A. But she let him drive.

{¶58} "Q. Yes.  Let him drive it.  No question about it.  But at that point, she's in the car, the guns are in the car and he's driving away, correct?

{¶59} "A. My understanding, yes, sir."

{¶60} On re-direct examination, the following exchange took place between the prosecutor and Mr. Snyder (pages 446-447 of the transcript):

{¶61} "Q. But what did this Defendant do when Taemarr Walker asked to drive her car?

{¶62} "A. Allowed him to drive it.

{¶63} "Q. What did this Defendant do when Taemarr Walker put a bottle of liquor in the car?

{¶64} "A. I believe allowed him to do that as well.

{¶65} "Q. What did she tell you she knew Taemarr Walker's driving status was?

{¶66} "A. He had no driver's license.

{¶67} "Q. And what did she do when he asked to drive the car?

{¶68} "A. Allowed him to drive the car.

{¶69} "Q. And, eventually, after three hours of interviewing, what did this Defendant tell you about Taemarr Walker and at least the handgun in the car?

{¶70} "A. She saw him with the handgun when he got in the car.

{¶71} "Q. And what did she let him do with the car and the handgun in the car?

{¶72} "A. Drive it."

{¶73} Contrary to the dissent's position, the evidence establishes that appellant was more than an "innocent bystander." Contrary to the dissenting judge's allegation, this majority has not mischaracterized the record as the record reveals appellant's knowledge and involvement.

{¶74} Pursuant to *Schlee, supra*, the state presented sufficient evidence upon which the jury could reasonably conclude beyond a reasonable doubt that appellant aided and abetted Mr. Walker in transporting the guns and that the elements of R.C. 2923.16(B) and (C), complicity to improperly handling firearms in a motor vehicle, were proven. Thus, the trial court did not err in overruling appellant's Crim.R. 29 motion.

{¶75} Furthermore, in reviewing and weighing all the evidence presented, we determine that a jury could reasonably conclude appellant was guilty of the charged offenses. The jury heard all of the evidence presented by the state and its five witnesses, as addressed above, establishing appellant's guilt for the crimes committed. The jury apparently placed great weight on and chose to believe the state's witnesses. *DeHass, supra*, at paragraph one of the syllabus. Based on the evidence presented, we cannot say the jury clearly lost its way in finding appellant guilty of complicity to improperly handling firearms in a motor vehicle. *Schlee, supra*, at *14-15; *Thompkins, supra*, at 387.

14

{¶76} For the foregoing reasons, appellant's sole assignment of error is not well-taken. The judgment of the Trumbull County Court of Common Pleas is affirmed.

CYNTHIA WESTCOTT RICE, P.J., concurs,

TIMOTHY P. CANNON, J., dissents with a Dissenting Opinion.

_____

TIMOTHY P. CANNON, J., dissenting.

{¶77} I do not agree that there was sufficient evidence to support appellant's convictions for complicity to improperly handling firearms in a motor vehicle. I therefore dissent from the majority's decision to affirm appellant's convictions.

{¶78} The majority opinion states appellant "saw Mr. Walker with the long rifle and believed he placed it inside her car when she went around the vehicle to get in the passenger's seat." If this is intended to suggest that appellant was aware Mr. Walker had a rifle before he got in the car, it is a mischaracterization of the statements made by appellant. In an interview with the BCI agent, appellant stated she never saw the long rifle until after they were in the ditch and Mr. Walker had moved into the backseat of the vehicle where the rifle was apparently located. At one point, when asked how the rifle got into the vehicle, appellant stated Mr. Walker must have put it in the backseat before he got into the driver's seat because it had not been there when she left to pick him up. She also stated, "When I went around the car I guess that's when he put it in there because he had a bottle of liquor, too." She never stated she saw him put the rifle in the backseat or that she had knowledge of him putting the rifle in the backseat.

15

**{¶79}** The state's position, as set forth in its brief, is that "Appellant aided and abetted Walker in the commission of both weapon offenses by permitting him to place two firearms into her car while at II Hype, and permitting him to drive her vehicle ferrying those weapons despite the fact that she knew he was an unlicensed driver." The majority opinion also states appellant "allowed" Mr. Walker to place the firearms in her vehicle and drive her vehicle carrying those weapons. Again, this is not supported by the record. During her interviews with BCI, appellant stated that when she picked up Mr. Walker from the bar, he told her he was going to drive the car home. She got out of the car, and Mr. Walker took over the driver's seat before she made it around the vehicle to the front passenger's seat. At first, appellant denied seeing the handgun. After further questioning, she admitted witnessing Mr. Walker take the handgun from his waistband and placing it under the driver's seat before he began to drive away. She stated they did not discuss the handgun. There was no evidence presented that appellant was aware Mr. Walker intended to transport two firearms when she gave him permission to drive the car, that appellant gave Mr. Walker permission to place the handgun in the vehicle, or that she was anything more than an innocent bystander to Mr. Walker's decision to break the law. The extended references by the majority to Agent Snyder's testimony make no reference to any such evidence.

**{¶80}** "[K]nowledge and observation of a crime, without more, cannot form the basis of a conviction for complicity." *State v. Buelow*, 10th Dist. Franklin Nos. 07AP-317 & 07AP-318, 2007-Ohio-5929, ¶33. In order to establish complicity, the state must show (1) that the accused actually supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime *and* (2) that the accused

16

shared the principal's criminal intent. *Id.* at ¶30, citing *State v. Johnson*, 93 Ohio St.3d 240, 2001-Ohio-1336, at syllabus.

**{¶81}** The state presented absolutely no evidence to establish either of these prongs. Merely presenting evidence that appellant witnessed Mr. Walker committing a crime in a vehicle she owns does not equate to cooperation, support, or assistance with the crime. At best, the only evidence presented at trial was that appellant gave Mr. Walker permission to drive her car; she was seated in the passenger seat before she ever saw the handgun; and she did not see the long rifle until Mr. Walker drove the car into the ditch.

**{¶82}** The prosecution and the majority herein emphasize that Mr. Walker was driving in the opposite direction of appellant's home, where appellant has consistently stated they were headed. Appellant also stated she did not know Mr. Walker was headed in the wrong direction when they left the bar. She had moved to Warren from the state of Michigan less than three months prior to the incident and had never patronized that particular bar.

**{¶83}** This is not sufficient evidence upon which a jury reasonably could conclude that appellant was complicit with Mr. Walker's intention to improperly handle firearms in her vehicle before she gave him permission to drive the vehicle and consented to be a passenger. In order to share Mr. Walker's intent to transport the firearms, and in order to *infer* appellant's intent, as the state encourages us to do, it would need to establish, at a minimum, that appellant was aware of Mr. Walker's intent when she gave him permission to drive her vehicle. There is no such evidence in the record.

{¶84} Respectfully, I would reverse and vacate appellant's convictions for complicity.